STATE OF NEBRASKA, APPELLEE, V.
ELIZABETH VICTORIA FARR, APPELLANT.

306 N.W.2d 854

Filed June 12, 1981. No. 43667.

P. M. Conley for appellant.

Paul L. Douglas, Attorney General, and Marilyn B. Hutchinson for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

KRIVOSHA, C.J.

The appellant, Elizabeth Victoria Farr (Farr), was convicted of violating Neb. Rev. Stat. § 28-912 (Reissue 1979) by unlawfully removing herself from official detention following conviction for the commission of an offense, and was ordered by the trial court to be incarcerated in an institution under the jurisdiction of the Department of Correctional Services for a period of 1 year. It is from this judgment and order Farr now ap-

peals to this court. We affirm.

On December 27, 1978, Farr was sentenced to 1 year's probation for a misdemeanor offense of destruction of property. On May 8, 1979, an affidavit to revoke her probation was filed. On May 25, 1979, Farr pled nolo contendere to the motion to revoke her probation and she was sentenced to a term of 6 months in the county jail. She began to serve her sentence on June 3, 1979.

The record further discloses that Farr and a member of the Lincoln Police Department (detective) knew each other and that from time to time Farr had given police officers, including this detective, information regarding various criminal matters. Shortly after July 1, 1979, and while Farr was serving her 6-month sentence in the city jail, the detective saw her in the hallway of the jail and asked her if she had any idea about a series of robberies that had been going on at several Safeway stores in Lincoln and at several Arby's restaurants in Lincoln during the month of June 1979 involving a white female suspect. Farr told the detective she might possibly be able to help and he told her he would talk to her about it later.

A few days later the detective returned to the jail where he visited with Farr about the robberies. Farr was shown a composite drawing of the suspect in the robbery cases. She thought the drawing was familiar but could not, at that time, remember the individual's name.

When the detective and Farr met again in the hallway of the jail several days later, she told him she thought she had a piece of paper at her mother's house that had the name of the suspect in the robbery written upon it. The detective arranged to take Farr to her mother's house to look for the paper with the name written upon it. She was then taken by the detective to her mother's home where they looked for the paper. After a short time, Farr reported to the detective that she was unable to locate the piece of paper but thought she knew some people who lived at an apartment house in Lincoln who might be able to help her. When they arrived at the

apartment they apparently found that the people that the appellant was looking for had moved, and Farr was returned to the jail.

The detective next spoke to Farr a few days later when she called regarding the physical condition of her boyfriend who had been arrested. She advised the detective that if she were able to speak to her boyfriend she was certain that she could find out the name of the individual involved in the armed robberies. As a result of that offer, a meeting was arranged between herself and her boyfriend, and Farr was brought to police headquarters where she met with her boyfriend. Further conversation followed concerning the possible robbers of the Safeway stores and Arby's restaurants, but Farr was still unable to provide the detective with the name and she was returned to jail.

On July 10, 1979, Farr again contacted the detective and advised him that she had been unable to get in contact with her boyfriend who, she said, knew the name of the robber, but claimed that if they went to her mother's home again she could look for her boyfriend along the way or that he might be at her mother's house. She also advised the detective that she could look again for the piece of paper that had the robbery suspect's name written on it. She further advised the detective that her mother, who was watching her children while she was in jail, was ill and she would like to check on the welfare of her children who were staying with her mother. The detective testified that Farr actually begged him to take her so that she could check on the welfare of her children and that she guaranteed that if she was allowed to do that she would provide the name of the robbery suspect.

As a result of that offer, the detective checked Farr out of jail and took her to her mother's house in a police cruiser. Farr and the detective both entered the mother's house. When Farr went into a bedroom the detective stepped outside of the living room onto the front porch and lit a cigarette. He waited on the porch for about 1 or 1½ minutes. When he did not hear or see

anyone inside the house, he went into the house and called Farr by name. He then walked through the house and could not find her. Farr's mother appeared and told him that Farr had taken off running. The detective attempted to locate Farr in the area but was unsuccessful. She was apprehended and returned to jail some 36 or 37 days later.

Farr's principal argument is that when the police detective removed her from jail and took her to her mother's home it was solely for personal reasons and not official reasons. She therefore maintains that while she was with the detective she was not in legal custody and therefore could not violate § 28-912(1). We believe that the argument is neither persuasive nor correct.

The pertinent portions of the statute involved in this action provide as follows: "(1) A person commits escape if he unlawfully removes himself from official detention . . . . Official detention shall mean . . . detention in . . . any facility for custody of persons under . . . conviction of crime . . . or any other detention for law enforcement purposes . . . .

. . . .

"(3) Irregularity in bringing about or maintaining detention . . . shall not be a defense to prosecution under this section if the escape is from . . . detention pursuant to commitment by official proceedings."

In examining the statute, we must keep certain rules of construction in mind. To begin with: "A sensible construction will be placed upon a statute to effectuate the object of the legislation rather than a literal meaning that would have the effect of defeating the legislative intent." *State v. Nance*, 197 Neb. 257, 260, 248 N.W.2d 339, 341 (1976). " 'The legislative intent, when apparent from the whole statute, is not to be thwarted by strained and unusual interpretations of particular words not required under the circumstances . . . .' " *Tom & Jerry, Inc. v. Nebraska Liquor Control Commission*, 183 Neb. 410, 419, 160 N.W.2d 232, 239 (1968). "It is a fundamental rule of statutory construction that, if possible, a court will try to avoid a construction which leads to

absurd, unjust, or unconscionable results." *State v. Saltzman*, 194 Neb. 525, 531, 233 N.W.2d 914, 918 (1975). Furthermore: "A statute should be construed in the context of the object sought to be accomplished, the evils and mischief sought to be remedied, and the purpose to be served." *State v. Nance, supra* at 260, 248 N.W.2d at 341.

In the recent case of *City of Lincoln v. Nebraska Liquor Control Comm.*, 208 Neb. 630, 634, 304 N.W.2d 922, 925 (1981), we said: "A statute is not to be read as if open to construction as a matter of course. Where the words of a statute are plain, direct, and unambiguous, no interpretation is needed to ascertain the meaning. In the absence of anything to indicate the contrary, words must be given their ordinary meaning. It is not within the province of a court to read a meaning into a statute that is not warranted by legislative language. Neither is it within the province of a court to read anything plain, direct, and unambiguous out of a statute." See, also, *O'Neill Production Credit Assn. v. Schnoor*, 208 Neb. 105, 302 N.W.2d 376 (1981).

We believe that when we apply the rules noted above to the statute in question and the facts of this case, we can reach no other conclusion but that Farr did indeed commit an escape in violation of § 28-912.

The evidence unquestionably supports the view that at the time Farr fled from her home she was then being detained in a facility for custody of persons under conviction, pursuant to commitment by official proceedings; and the fact that she was then temporarily in the custody of a member of the Lincoln Police Department, authorized to remove individuals from the confines of the jail complex for official purposes, does not change the situation. Clearly, Farr knew that she was not free to go or to accept any offers which would preclude her returning to the jail complex as soon as the purpose of her going to her mother's home was concluded.

Farr vigorously argues that the purpose of removing her from the jail complex and taking her to her mother's home was not for official business, but rather for the

personal benefit of Farr. In this regard there is indeed some conflict in the evidence. Farr maintains that her trip to her mother's home was purely for personal reasons and without any intent to obtain for the police detective the name of a burglary suspect. The police detective, on the other hand, vigorously denies that to be the case, and maintains that he would not have taken her to her mother's home at her request but for her assurance that if he did so she would deliver to him the name of the burglar at some point in time, if not right then. He testified on direct examination as follows:

"Q Was the purpose of your transporting the defendant to the premises at 2030 P Street in Lincoln, Lancaster County, Nebraska, on July 10th, 1979, to pursue the investigation of the armed robberies you have earlier described?

. . . .

"A Yes.

"Q And that, at least, was your purpose, is that correct?

"A Yes, sir.

"Q Did you have any other purpose in going to that address?

"A Yes, sir.

"Q What was the other purpose?

"A Miss Farr has been a source of information for me for quite a few number of years, and I have done numerous things in order to keep her supplying this source of information, and I was afraid that if I didn't take her there on that particular day, even though I didn't feel that she was going to come up with the name that she had promised, that she would become angry or get mad and would refuse to supply information to me in the future regarding these cases that were currently under investigation, or future cases that would be under investigation."

The evidence of the detective, if believed, would clearly establish that his purpose in taking Farr out of the jail complex and to her mother's home, from whence she fled, was because of police motives and not because

of personal motives. Farr disputes that fact, but that conflict was resolved by the trial court and is not for us to reexamine. "It is not the province of this court to resolve conflicts in the evidence, pass upon the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. Such matters are for the trier of fact and the verdict must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it." *State v. Woodruff*, 205 Neb. 638, 640-41, 288 N.W.2d 754, 757 (1980). See, also, *State v. Carter*, 205 Neb. 407, 288 N.W.2d 35 (1980); *State v. Clermont*, 204 Neb. 611, 284 N.W.2d 412 (1979). Under the facts in this case it is clear that at the time Farr fled she was both still being detained in custody pursuant to commitment by official proceedings as a person convicted of a crime and in custody of the police detective for law enforcement purposes. The trial court was correct in its finding, and its judgment and sentence must be affirmed.

AFFIRMED.